UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
HIRAM MONSERRATE, *individually and as an*        :
*elected official and member of the New York*
*State Senate*, CELESTE RODRIGUEZ,                 :
MICHAEL A. NARDIELO III, MONIFA AFIA
BEY, REV. NANCY TORRES, LORETTA K.                 :
HENDERSON, and MALIKAH SHABAZZ,
*individually and as duly registered and qualified* :
*voters in the New York State 13th Senatorial*
*District*,                                         :

              Plaintiffs,                :

        -against-                        :

THE NEW YORK STATE SENATE,                         :
MALCOLM A. SMITH, *in his official capacity*
*as Temporary President of the New York State*     :
*Senate*, ANGELO J. APONTE, *in his official*
*capacity as Secretary of the New York State*      :
*Senate*, THOMAS P. DINAPOLI, *in his official*
*capacity as State Comptroller of the State of New* :
*York*, ERIC SCHNEIDERMAN, *in his official*
*capacity as Senator of the State of New York and*  :
*Chair of the New York State Senate Select*
*Committee to Investigate the Facts and*           :
*Circumstances Surrounding the Conviction of*
*Hiram Monserrate on October 15, 2009*, DAVID      :
A. PATERSON, *in his official capacity as*
*Governor of the State of New York*, RICHARD        :
RAVITCH, *in his official capacity as Lieutenant*
*Governor of the State of New York, and*           :
LORRAINE CORTES-VAZQUEZ, *in her official*
*capacity as Secretary of State for the State of*   :
*New York*,
                        :

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

10 Civ. 1106 (WHP)

MEMORANDUM & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/19/2010

WILLIAM H. PAULEY III, District Judge:

Plaintiffs Hiram Monserrate ("Monserrate") and several voters from the 13th Senatorial District bring this federal civil rights action against the New York State Senate (the "Senate") and certain legislative and executive officers of the State of New York. Plaintiffs assert violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution and several state law claims. They move to preliminarily enjoin Defendants from enforcing a resolution expelling Monserrate from the Senate, holding a special election on March 16, 2010 in the 13th Senatorial District, and removing Monserrate from the payroll of the State of New York. For the following reasons, Plaintiffs' motion for a preliminary injunction is denied.

Monserrate challenges the power of the Senate to remove a duly-elected sitting member. This is a case of first impression as no legislator has ever contested his expulsion in New York. In an ironic twist, his attorneys characterize the Senate's action as an "unlawful coup" and argue that voters in the 13th Senatorial District have been disenfranchised by his removal. However, Governor David A. Paterson's immediate Proclamation of a Special Election empowers those voters. While this Court concludes that it has no legal basis to preliminarily enjoin the decision of the Senate, a "fundamental principle of our representative democracy is, in [Alexander] Hamilton's words, 'that the people should choose whom they please to govern them.'" Powell v. McCormack, 395 U.S. 486, 547 (1969) (quoting 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876)). Thus, the March 16 Special Election furthers the goals of Plaintiffs' current application to protect the voters of the 13th Senatorial District more effectively than judicial intervention.

-2-

## BACKGROUND

On November 4, 2008, Monserrate was elected to a two-year term in the Senate representing the 13th Senatorial District. (Complaint dated Feb. 10, 2010 ("Compl.") ¶¶ 7, 17.) On December 19, 2008, he was involved in a domestic dispute with Karla Giraldo ("Giraldo") at his apartment. (Report of the N.Y. State Senate Select Committee to Investigate the Facts and Circumstances of Surrounding the Conviction of Hiram Monserrate dated Jan. 13, 2010 (the "Report"), at 1.)  During the dispute, Giraldo sustained serious facial lacerations from a broken drinking glass. (Compl. ¶ 17; Report at 1, 6.)  Monserrate drove Giraldo to North Shore Long Island Jewish Medical Center, where she was treated for her injuries. (Report at 1, 6.) Emergency room personnel notified the NYPD of suspected domestic violence, and Monserrate was arrested. (Report at 7.)

On January 7, 2009, Monserrate took the oath of office and was seated in the Senate. (Compl. ¶¶ 7, 18.)  Ten weeks later, he was indicted on three felony and three misdemeanor assault counts in New York State Supreme Court (Queens County). (Report at 8.) Three felony and two misdemeanor counts related to events between Monserrate and Giraldo inside Monserrate's apartment. (Report at 8.)  The third misdemeanor count concerned events recorded by a surveillance camera in a hallway outside Monserrate's apartment. (Report at 8.)

Monserrate waived a trial by jury. (Record at 8-9.)  The ensuing bench trial from September 21 to October 13, 2009, before Justice William Erlbaum attracted intense public scrutiny. (Record at 8-12.)  On October 15, Justice Erlbaum found Monserrate guilty of a single misdemeanor—Assault in the Third Degree—because "the defendant . . . recklessly caused injury to Karla Giraldo by forcibly dragging her by her arm." (Report at 12.)  Justice Erlbaum

-3-

dismissed two counts of reckless assault at the conclusion of the People's case and acquitted Monserrate on the three remaining counts. (Report at 12-14.)

On November 9, 2009, the Senate adopted Resolution No. 3409 ("Resolution 3409") to establish "a Select Committee of the Senate to Investigate the Facts and Circumstances Surrounding the Conviction of Senator Hiram Monserrate on October 15, 2009" (the "Select Committee"). (Report at 2.) The Select Committee was comprised of nine senators—five appointed by the majority and four by the minority. (Report at 2.) Resolution 3409 "authorized and directed" the Select Committee to "investigate the facts and circumstances relating to the conviction against Senator Monserrate" and report its findings with a recommendation regarding sanctions. (Report at 2; Declaration of Angelo J. Aponte dated Feb. 16, 2010 ("Aponte Decl.") Ex. B: Senate Resolution 3409 dated Oct. 15, 2009 ("Resolution 3409") at 2.)

On December 4, 2009, Justice Erlbaum sentenced Monserrate to three years probation, 250 hours of community service, and one year of domestic abuse counseling and assessed a $1000 fine. (Report at 14.) He entered a five-year order of protection—ordering Monserrate to refrain from any contact with Giraldo. (Report at 14.)

The Select Committee convened on six occasions over two months. (Report at 4.) The Select Committee reviewed, inter alia, Monserrate's trial record, Giraldo's grand jury testimony, cell phone records, a notarized statement by Giraldo, and public interviews given by Monserrate. (Report at 4-5.) The Select Committee notified Monserrate of its hearings and furnished him with the materials circulated to members of the Select Committee. (Resolution 3409 at 2; Declaration of Daniel R. Alonso dated Feb. 16, 2010 ("Alonso Decl.") Ex. D: Letter from Daniel R. Alonso to Joseph Tacopina dated Nov. 6, 2009; Ex. F: Letter from Daniel R.

-4-

Alonso to Joseph Tacopina dated Nov. 11, 2009; Ex. I: Letter from Daniel R. Alonso to Joseph

Tacopina dated Nov. 18, 2009; Ex. J: Letter from Daniel R. Alonso to Joseph Tacopina dated

Nov. 25, 2009.)

        Monserrate declined the Select Committee's invitation to testify or offer any

evidence. (Report at 4.) Giraldo also refused to participate in the Select Committee

investigation. (Report at 5.) However, from the beginning of the inquiry, Monserrate's counsel

communicated with the Select Committee about potential sanctions. Notably, in a letter dated

November 13, Monserrate's counsel questioned the power of the Senate to expel a member.

(Alonso Decl. Ex. G: Letter from Chad Siegel to Daniel Alonso dated Nov. 13, 2009 at 1.)

        On January 13, 2010, the Select Committee issued its unanimous report (the

"Report") recommending the expulsion or censure of Monserrate:

> Having considered the available evidence and evaluated the facts
> relating to the conduct that provided the basis for Senator
> Monserrate's conviction, the Select Committee finds that this case
> is serious enough to warrant a severe sanction. In doing so, we are
> mindful that ultimately, the voters of Senator Monserrate's district,
> where he plans to run for re-election, will decide whether or not he
> is returned to office. . . .
>
>     The Select Committee finds that the nature and seriousness
> of Senator Monserrate's conduct, as demonstrated by the
> surveillance video and other unrebutted evidence outlined in this
> Report, showed a reckless disregard for Ms. Giraldo's well-being
> and for the severity of her injury. We therefore find, that under the
> particular facts and circumstances presented here, Senator
> Monserrate's misconduct damages the integrity and reputation of
> the New York State Senate and demonstrates a lack of fitness to
> serve in this body.

> Accordingly, the Select Committee recommends that Senator Monserrate be sanctioned by the full Senate, and that the Senate vote to impose of one of two punishments: expulsion, or in the alternative, censure with revocation of privileges.

(Report at 53.)

On February 9, 2010, the Senate considered Senate Resolution 3691, which

provided in part:

> RESOLVED, That the Senate of the State of New York does hereby condemn the conduct of Senator Monserrate surrounding his conviction for reckless assault; and be it further;

> RESOLVED, That the actions of Senator Monserrate, as measured in their totality, are not compatible with his oath of office and the qualifications and behavior expected of and by a State Senator for the State of New York.

The Senate adopted Resolution 3691 by a vote of 53 to 8 and expelled Monserrate without

debate or further hearings. (Compl. ¶ 27.) The next day, Governor Paterson ordered a Special

Election in the 13th Senatorial District for March 16, 2010.

## DISCUSSION

I. Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy, one that should

not be granted unless the movant, by a clear showing, carries the burden of persuasion."

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). "The typical preliminary injunction is

prohibitory and generally seeks only to maintain the status quo pending a trial on the merits."

Mastrovincenzo v. City of N.Y., 435 F.3d 78, 89 (2d Cir. 2006). In such a case, "the district

court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and

(2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the

merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." Lynch v. City of N.Y., 589 F.3d 94, 98 (2d Cir. 2009). However, "when the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." Beal v. Stern, 184 F.3d 117, 122 (2d Cir. 1999) (internal quotation marks and citation omitted).

"A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act and thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." Mastrovincenzo, 435 F.3d at 89 (internal alterations and quotation omitted). "[A] district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." Mastrovincenzo, 435 F.3d at 89 (emphasis omitted).

"[T]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics." Jolly v. Coughlin, 76 F.3d 468, 474 (2d Cir. 1996). Moreover, "many mandatory injunctions can be stated in seemingly prohibitory terms." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995). Accordingly, courts in this Circuit impose the heightened "substantial likelihood of success" standard where, "[t]hough the order is prohibitory in form, rather than mandatory, it accomplishes significantly more than preservation of the status quo." SEC v. Unifund SAL, 910 F.2d 1028, 1040 (2d Cir. 1990).

Monserrate seeks to enjoin enforcement of a Senate Resolution, his removal from the State payroll, and the Special Election procedures now underway. This would not preserve

-7-

the status quo. On the contrary, it would fundamentally "change the positions of the parties as

[they] existed prior to the grant" of the injunction and therefore is squarely "in the nature of

mandatory injunctive relief." Beal, 184 F.3d at 123 (internal quotation marks omitted).[1]

Accordingly, this Court applies the heightened standard of "clear" or "substantial" likelihood of

success on the merits appropriate for Monserrate's application.

II. Justiciability

"[T]he political question doctrine is a function of the constitutional framework of

separation of powers." 767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed. Republic

of Yugoslavia, 218 F.3d 152, 164 (2d Cir. 2000); see also N.Y. State Inspection, Sec. & Law

Enforcement Employees, Dist. Council 82, AFSCME, AFL-CIO v. Cuomo, 475 N.E.2d 90, 93

(N.Y. 1984) ("This judicial deference to a coordinate, coequal branch of government includes

one issue of justiciability generally denominated as the 'political question doctrine.'"). This

doctrine is "designed to restrain the Judiciary from inappropriate interference in the business of

the other branches of Government." United States v. Munoz-Flores, 495 U.S. 385, 394 (1990).

The Supreme Court has explained:

> Prominent on the surface of any case held to involve a political
> question is found [1] a textually demonstrable constitutional
> commitment of the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable standards for
> resolving it; or [3] the impossibility of deciding without an initial
> policy determination of a kind clearly for non-judicial discretion;
> or [4] the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate

---

[1] If the Special Election was enjoined and Monserrate was restored to the Senate and this Court later determined (after April 1) that a permanent injunction was not warranted, then the voters of the 13th Senatorial District would be unrepresented for the balance of Monserrate's unexpired term. (Transcript of Hearing dated Feb. 18, 2010, at *__.)

> branches of government; or [5] an unusual need for unquestioning
> adherence to a political decision already made; or [6] the
> potentiality of embarrassment from multifarious pronouncements
> by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217 (1962).

"Baker set a high bar for nonjusticiability: Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 321 (2d Cir. 2009). However, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" Baker, 369 U.S. at 211.

Monserrate's federal claims are not cabined by Baker because they involve the relationship between the federal and a state government, as opposed to coordinate, co-equal branches. Accordingly, they are justiciable.

III. Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 119 (2d Cir. 2009) (internal quotation marks omitted). Assuming arguendo that Monserrate's expulsion violates the Constitution, Plaintiffs demonstrate irreparable harm. See Lynch, 589 F.3d at 99; see also Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992) (concluding that a possible deprivation of constitutional rights sufficiently demonstrated a likelihood of irreparable harm).

IV. Likelihood of Success of the Merits

    A. First & Fourteenth Amendment Claims of Voter Plaintiffs

            "The Supreme Court has . . . made clear that while voting enjoys constitutional protection, every law that imposes a burden on the right to vote need not be subject to strict scrutiny." Schulz v. Williams, 44 F.3d 48, 56 (2d Cir. 1994); Bullock v. Carter, 405 U.S. 134, 142 (1972) ("Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review."). It is only "[t]hose regulations that impose 'severe' restrictions [that] 'must be narrowly drawn to advance a state interest of compelling importance.'" Schulz, 44 F.3d at 56 (quoting Burdick v. Takushi, 504 U.S. 428, 433 (1992)). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions . . . the State's important regulatory interests are generally sufficient to justify the restrictions." Burdick, 504 U.S. at 434 (internal quotation marks omitted).

            "To determine the rigorousness of [its] inquiry, [a court] must evaluate the weight of the burden imposed by the challenged requirement." Schulz, 44 F.3d at 56. In the election context, courts in this Circuit "proceed by the 'totality approach' and consider the alleged burden imposed by the challenged provision in light of the state's overall election scheme." Schulz, 44 F.3d at 56 (quoting LaRouche v. Kezer, 990 F.2d 36, 39 (2d Cir. 1993)). The inquiry examines, inter alia, the restriction's past effect on voting rights, judicial precedents of comparable voting regulations, and the facts and circumstances presented in a particular case. Schulz, 44 F.3d at 56.

            "The critical question is 'the extent to which a challenged regulation burdens First and Fourteenth Amendment [voting] rights.'" Rockefeller v. Powers, 74 F.3d 1367, 1377 n.16 (2d Cir. 1995) (quoting Burdick, 504 U.S. at 434); see also Unity Party v. Wallace, 707 F.2d 59,

61 (2d Cir. 1983) ("We must . . . examine the nature, extent and likely effect of the law on the interests of those claiming to be fenced out by it.").

Although the Second Circuit articulated this test in the context of ballot access, its application is also appropriate in this case. Examining the totality of the circumstances, the burden on voting rights in this case is slight. The seat in the 13th Senatorial District will only be vacant for a few weeks. The Governor promptly called the Special Election, and the electoral process is underway. Moreover, the burden here is no greater than that imposed by occasional vacancies due to death or resignation. Cf. Rodriguez v. Popular Democratic Party, 457 U.S. 1, 10 n.10 (1982) ("A vacancy in the legislature is an unexpected, unpredictable event, and a statute providing that all such vacancies be filled by appointment does not have a special impact on any discrete group of voters or candidates."); Valenti v. Rockefeller, 393 U.S. 405 (1969) (upholding power of New York's Governor to fill vacant U.S. Senate seat by appointment until the next election in 29 months). Also, there is no exceptional restriction on who may seek to replace him.

In addition, expulsion of a sitting legislator is infrequent and the power of a body to determine the fitness of its members is embedded in American democracy. Monserrate was expelled only after a specially-formed committee investigated his actions and an overwhelming majority of the Senate authorized expulsion. Similar processes to discipline have long existed in deliberative bodies at all levels of government. See Whitner v. McWatters, 112 F.3d 740, 744-45 (4th Cir. 1997); Gerard v. La. State Senate, 408 So. 2d 426, 429 (La. Ct. App. 1983); State ex rel. James v. Reed, 364 So. 2d 303 (Ala. 1978); Sweeny v. Tucker, 375 A.2d 698 (Pa. 1977); Reaves v. Jones, 515 S.W.2d 201 (Ark. 1974); French v. Senate of State of Cal., 80 P. 1031 (Cal. 1905); Hiss v. Bartlett, 69 Mass. 468 (1855); Note, The Legislature's Power to Judge the

-11-

Qualifications of Its Members, 19 Vand. L. Rev. 1410 (1966); Richard B. Hupman, Senate

Election, Expulsion & Censure Cases from 1789 to 1960, S. Doc. No. 71, 87th Cong., 2d Sess.

(1962); T. Taswell-Langmead's English Constitutional History 583-584 (11th ed., T. Plucknett,

1960) (discussing expulsion of Robert Walpole in 1711); R. Luce, Legislative Assemblies,

(1924); I William Blackstone, Commentaries on the Laws of England 172 (1st ed. 1765).  The

Fourth Circuit, quoting none other than Joseph Story, summarized the reason for this power:

> No person can doubt the propriety of the provision authorizing each house to determine the rules of its own proceedings. If the power did not exist, it would be utterly impracticable to transact the business of the nation, either at all, or at least with decency, deliberation, and order. The humblest assembly of men is understood to possess this power; and it would be absurd to deprive the councils of the nation of a like authority. But the power to make rules would be nugatory, unless it was coupled with a power to punish for disorderly behavior, or disobedience to those rules.

Whitner, 112 F.3d at 744-45 (quoting Joseph Story, Commentaries on the Constitution of the

United States § 419 (1836) (emphasis added)).[2]

In view of the totality of the circumstances—the long history of the power to

expel legislators, the limited use of the power, judicial approval of this type of restriction in the

past, the brief interval before a new Senator is chosen, and the gravity of Monserrate's alleged

conduct—this Court concludes that the burden on voting rights in the 13th Senatorial District is

gossamer.  Accordingly, a strict scrutiny analysis is not warranted.  "Rather [the court] need[s] to

---

[2] Kucinich v. Forbes, 432 F. Supp. 1101, 1116 (N.D. Ohio 1977), stands alone for the proposition that this Court should apply strict scrutiny to suspension or expulsion by a legislative body.  However, the dicta in Kucinich offers no reason why strict scrutiny should apply.  And, in any event, the decision is not binding on this Court.

evaluate only whether the requirement is justified by a 'legitimate interest' and is a 'reasonable way of accomplishing this goal.'" Schulz, 44 F.3d at 57 (quoting Burdick, 504 U.S. at 740).

New York has an interest in the orderly operation of its legislature. This Court is required to "pass judgment on the legitimacy and strength of the state's proffered interests." Schulz, 44 F.3d at 58 (internal alterations and quotation marks omitted). Plaintiffs offer only hypothetical worst-case scenarios of the misuse of the expulsion power to discriminate against racial, ethnic, and political minorities. In contrast to the lack of evidence on Plaintiffs' application, the State proffers the expulsion power's lengthy history. In concluding that Monserrate "severely damaged the institution's honor, dignity, integrity, and public reputation," the Senate articulated its legitimate state interest and that its exercise of the expulsion power was a reasonable way to satisfy that interest. Accordingly, this Court finds that there is little likelihood of success on the Plaintiffs' voting rights claims under the First and Fourteenth Amendments.

### B. Liberty Interest Claim

While "[a] person's interest in his or her good reputation alone . . . is not a liberty or property interest sufficient to invoke . . . the Due Process Clause," the "[l]oss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir. 2004). This type of liberty interest claim is commonly referred to as a "stigma plus" claim. Patterson, 370 F.3d at 330. Such a claim requires a plaintiff to show, inter alia: "(1) the utterance of a statement about [him] that is injurious to [his] reputation, that is capable of being proved false and he or she claims is false,

-13-

and (2) some tangible and material state-imposed burden . . . in addition to the stigmatizing

statement." Valez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation marks omitted);

accord Segal v. City of N.Y., 459 F.3d 207, 212 (2d Cir. 2006). "The defamatory statement must

be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff,

and only in private, ordinarily does not implicate a liberty interest." Valez, 401 F.3d at 87.

"Similarly, because a free-standing defamatory statement is not a constitutional deprivation, but

is instead properly viewed as a state tort of defamation, the 'plus' imposed by the defendant must

be a specific and adverse action clearly restricting the plaintiff's liberty—for example, the loss of

employment. . . ." Valez, 401 F.3d at 87-88.

        While the parties dispute a number of aspects of Monserrate's claim, even if he

could establish each of those elements, his stigma plus claim would still fail if he received

adequate pre-deprivation process. See Valez, 401 F.3d at 93. "[T]he availability of adequate

process defeats a stigma-plus claim." Segal, 459 F.3d at 213. Where, as here, "the government

actor in question is a high-ranking state official with final authority over significant matters,"

pre-deprivation process is required to satisfy the dictates of due process. Valez, 401 F.3d at 91

("where established state procedures are involved, pre-removal hearings will normally be

required").

        Although Valez does not prescribe what pre-deprivation process is adequate to

defeat a stigma plus claim, "[t]he touchstone of due process, of course, is the requirement that a

person in jeopardy of serious loss [be given] notice of the case against him and opportunity to

meet it." Spinelli v. City of N.Y., 579 F.3d 160, 169 (2d Cir. 2009) (internal quotation marks

omitted); see also Morrissey v. Brewer, 408 U.S. 471, 481 (1972). To dispel a stigma plus claim,

-14-

the appropriate process is a hearing in which the plaintiff is afforded "an opportunity to clear [his] name." Velez, 401 F.3d at 91. "The 'timing and nature of the required hearing will depend on appropriate accommodation of the competing interests involved.'" Krimstock v. Kelly, 306 F.3d 40, 51-52 (2d Cir. 2002) (quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982)). "In determining how much process is due, a court must weigh (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest." Spinelli, 579 F.3d at 170 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

The first factor clearly weighs in Monserrate's favor. A stigma plus claim implicates "the plaintiff's reputational interest, and how that interest can effect [sic.] his standing in the community and his future job prospects." Patterson, 370 F.3d at 336. Here, Monserrate's interests in keeping his job and maintaining his reputation are substantial. As to the third factor, the government's interest encompasses appropriately censuring legislators who "are not performing to expected standards or are behaving in an unacceptable fashion." Patterson, 370 F.3d at 337.

Returning to the second factor, "the risk inherent in a stigma-plus claim is the risk that the false charges against the plaintiff will go unrefuted and that his name will remain stigmatized. Such risk varies depending on the effectiveness of the procedures available and the promptness by which they were afforded." Segal, 459 F.3d at 215 (internal quotation and citation omitted). Because there is no property right to state political office secured by the Due Process Clause, Snowden v. Hughes, 321 U.S. 1, 7 (1944), Monserrate "ha[s] no right to a particular outcome following a name-clearing hearing" but only to "an opportunity to salvage

-15-

[his] name." Segal, 459 F.3d at 216 (applying standard in context of at-will employment in which plaintiff similarly lacked property interest in her position).

"Notice, to comply with due process requirements . . . must set forth the alleged misconduct with particularity." In re Gault, 387 U.S. 1, 33 (1967) (internal quotation marks omitted). "The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations." Spinelli, 579 F.3d at 172. "The degree of required specificity also increases with the significance of the interests at stake." Spinelli, 579 F.3d at 172.

While the interests here were clearly substantial, the notice afforded—in the form of Resolution 3409 creating the Select Committee—was sufficiently specific. Resolution 3409 unambiguously references Monserrate's indictment and conviction in New York State Supreme Court. It further notes that "[a] conviction for such misdemeanor offense does not result in the automatic forfeiture of office upon conviction under the Public Officers Law," but states that "[t]he seriousness of these domestic violence charges and the circumstances surrounding them warrant further investigation by the Senate, and may warrant the imposition of sanctions by the Senate." Finally, Resolution 3409 "authorized and directed" the Select Committee "to investigate the facts and circumstances surrounding the conviction of Senator Hiram Monserrate is hereby established . . . such committee is hereby authorized and directed to investigate the facts and circumstances relating to the conviction against Senator Monserrate" and "report to the Senate with its recommendations."

-16-

While not exhaustive, Resolution 3409's notice alerted Monserrate to the parameters of the Select Committee's inquiry. Consistent with N.Y. Civil Rights Law § 73(3), Monserrate was informed that he could testify and present arguments through counsel. See Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 467 (2d Cir. 2006). Contrary to Monserrate's attorneys' assertion in their moving papers of "a surprise ending," (Pls. Opening Br. 2), the record demonstrates that Monserrate fully understood the possibility that the Select Committee might recommend expulsion. Given these circumstances the notice afforded Monserrate was sufficient. Cf. Patterson, 370 F.3d at 337 (inadequate process where plaintiff was not given any notice of a meeting at which the allegations against him were discussed).

As for the opportunity to be heard, a pre-deprivation hearing "though necessary, need not be elaborate," Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985), and "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," Boddie v. Connecticut, 401 U.S. 371, 378 (1971). The "fundamental due process requirement" is an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken." Loudermill, 470 U.S. at 546. Yet Monserrate concedes the Senate afforded exactly that—"an open invitation . . . to address the committee, whether in person or by written submission"—neither of which he chose to do. "[W]here, as here, the plaintiff has available adequate process, [he] cannot be said to have been 'deprived of due process simply because [he]

-17-

failed to avail [himself] of the opportunity.'"[3]  Segal, 459 F.3d at 218 n.10 (citation omitted); see

also Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 435-36 (1982)

(considering plaintiff's failure to avail himself of opportunity to present arguments to

investigative committee as a factor in declining to enjoin ongoing state proceedings).  Moreover,

the Select Committee heard from no witnesses but relied on the transcript of Monserrate's

criminal trial where he had a strong interest in defending himself.  Accordingly, Monserrate's

stigma-plus claim has little likelihood of success because he received adequate pre-deprivation

process.

   C.   Vagueness of Legislative Law § 3

            The Fourteenth Amendment's guarantee that no state shall "deprive any person of

life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, entitles a

person to "be informed as to what [a state law] commands or forbids."  Thibodeau v. Portuondo,

486 F.3d 61, 65 (2d Cir. 2007) (Sotomayor, J.) (citing Lanzetta v. N.J., 306 U.S. 451, 453

(1939)).  Thus, procedural due process prevents the enforcement of a law whose language is "so

vauge that men of common intelligence must necessarily guess at its meaning and differ as to its

application."  Connally v. Gen. Const. Co., 269 U.S. 385, 391 (1926).  The "void-for-vagueness"

doctrine requires first that laws "be crafted with sufficient clarity to give the person of ordinary

intelligence a reasonable opportunity to know what is prohibited" and second that laws "contain

minimal guidelines to govern law enforcement."  Thibodeau, 486 F.3d at 65-66 (quoting

---

[3] Although Plaintiffs contend that Monserrate should have been given a full pre-deprivation
evidentiary hearing, such hearings are only required where "termination of aid pending
resolution of a controversy over eligibility may deprive an eligible recipient of the very means by
which to live while he waits."  Goldberg v. Kelly, 397 U.S. 254, 264, 268 (1970).

Betancourt v. Bloomberg, 448 F.3d 547, 552 (2d Cir. 2006)) (internal quotation marks omitted); see also Kolender v. Lawson, 461 U.S. 352, 358 (1983).

　　　　　"The Supreme Court has cautioned that this doctrine does not require 'meticulous specificity' from every statute." Thibodeau, 486 F.3d at 66 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." Vill. of Hoffman Estates v. Flipside Hoffman Estates, Inc., 455 U.S. 489, 498 (1982). Courts tolerate vagueness in a civil enactment over vagueness in a criminal penalty "because the consequences of imprecision are qualitatively less severe." Vill. of Hoffman, 455 U.S. at 498-99. However, where a "statute's literal scope, unaided by a narrowing . . . court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." Smith v. Goguen, 415 U.S. 566, 573 (1974).

　　　　　Although Legislative Law § 3 is a short and plain statement, it is neither standardless nor so unclear that a person of reasonable intelligence could not understand its meaning and application. Indeed, the language of § 3 implies the existence of several procedural safeguards including that (1) charges be formally lodged against a legislator, (2) a committee be organized to investigate the charges, and (3) the committee produce a report on the charges. As discussed above, these procedures satisfy the requirements of due process.

　　　　　Moreover, that § 3 does not enumerate each and every act which may result in sanction or expulsion from the Senate does not make the statute vague or overbroad. See Law Students Civil Rights Research Council, Inc. v. Wadmond, 401 U.S. 154, 163-64 (1971) (finding broad provisions of New York bar application rule requiring person to possess "the character and

general fitness requisite for an attorney" to be constitutionally permissible); <u>see also</u> <u>Nash v.</u>
<u>United States</u>, 229 U.S. 373, 377 (1913) (Holmes, J.) ("[T]he law is full of instances where a
man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some
matter of degree. . . . The criterion in such cases is to examine whether common social duty
would, under the circumstances, have suggested a more circumspect conduct." (internal citations
and quotation marks omitted)). Finally, because an investigation under § 3 is ultimately subject
to approval by a vote of the entire Senate, an investigating committee does not have "unfettered"
discretion to abuse its mandate or assess a penalty. <u>See</u> <u>United States v. Batchelder</u>, 442 U.S.
114, 124 (1979).

From the start of the investigation, Monserrate and his counsel recognized that
expulsion from the Senate was a possible consequence. That the New York State Legislature
has expelled members in the past put Monserrate on notice. Moreover, Monserrate cannot claim
to be unaware that his behavior was criminal. <u>See</u> New York Penal Law § 120.00(2). He knew
that a conviction under this statute could subject him to a prison sentence and he should have
been equally mindful that a conviction could compromise his fitness to serve as a legislator.
Accordingly, Monserrate's vagueness and overbreadth challenge to Legislative Law § 3 is
unlikely to succeed on the merits.

D. First Amendment Claim

To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate
that: (1) the conduct at issue is protected by the First Amendment; (2) the plaintiff suffered an
adverse decision; and (3) a causal connection existed between the speech and the adverse
determination, so that it can be said that the speech was a motivating factor in the determination.

-20-

See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87 (1977)). If a plaintiff establishes these three factors, the defendant has the opportunity to show that he would have taken the same adverse action "even in the absence of the protected conduct." Mt. Healthy City, 429 U.S. at 287.

Monserrate identifies to two types of protected conduct: (1) his participation in the parliamentary "coup" in 2009[4]; and (2) his statements to the media regarding the Select Committee. While a legislature's actions in retaliation for an individual's exercise of his First Amendment rights may give rise to a claim, see, e.g., Bond v. Floyd, 385 U.S. 116, 132-33 (1966); Kucinich, 432 F. Supp. at 1110-15; Ammond v. McGahn, 390 F. Supp. 655 (D.N.J. 1975), rev'd on other grounds, 532 F.2d 325 (3d Cir. 1976), Monserrate offers no evidence connecting his expulsion to the exercise of his First Amendment rights.

Nothing supports the claim that Monserrate's participation in the parliamentary "coup" led to his expulsion. Monserrate abandoned his parliamentary "coup" attempt months before his removal from office. Moreover, after his "coup" attempt, he was rewarded with a committee chairmanship. As for his statements to the media concerning the Select Committee's procedures, the only evidence he offers is a reference in the Report to those statements. There is no dispute that the Select Committee had begun its work when Monserrate commented to the media. See, e.g., Cotarelo v. Vill. of Sleepy Hollow Police Dep't, 460 F.3d 247, 253 (2d Cir.

---

[4] In 2009, the Democrats assumed majority control of the Senate for the first time in over 40 years. After appointment of a Democratic Temporary President and Majority Leader, Monserrate and others announced they would vote with the Republicans. Turmoil and stalemate ensued. After a number of weeks, Monserrate and others rejoined the Democratic caucus. One of the former "coup" members is now the Majority Leader, and Monserrate received a committee chairmanship.

-21-

2006) (no evidence of causal connection where police officer was "unlikely candidate for promotion" and deciders articulated legitimate reasons for denial); Washington v. Cty. of Rockland, 373 F.3d 310, 321 (2d Cir. 2004) (noting lack of evidence of any retaliatory animus) (Sotomayor, J.).

### E.  The State Law Claims

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The reach of the Eleventh Amendment has been interpreted to extend beyond the terms of its text to bar suits in federal courts against states, by their own citizens or by foreign sovereigns." State Employees Collective Bargaining Coal. v. Rowland, 494 F.3d 71, 95 (2d Cir. 2007) (internal alterations and quotation marks omitted).  Moreover, because state immunity extends to state officers who act on behalf of the state, see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 142-47 (1993), where the state is the "real, substantial party in interest," the Eleventh Amendment generally bars federal court jurisdiction over actions against state officials acting in their official capacities, Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101-02 (1984). "Under the well-known exception to this rule first set forth in Ex parte Young, 209 U.S. 123 (1908), however, 'a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.'" State Employees, 494 F.3d at 95 (quoting In re Deposit Ins. Agency, 482 F.3d 612, 617 (2d Cir. 2007)).

-22-

"It is well settled that federal courts may not grant declaratory or injunctive relief

against a state agency based on violations of state law." Bad Frog Brewery, Inc. v. N.Y. State

Liquor Auth., 134 F.3d 87, 93 (2d Cir. 1998) (citing Pennhurst, 465 U.S. at 106); see also Young

v. N.Y. City Transit Auth., 903 F.2d 146, 164 (2d Cir. 1990). Indeed, "[t]here is no 'greater

intrusion on state sovereignty than when a federal court instructs state officials on how to

conform their conduct to state law.'" Allen v. Cuomo, 100 F.3d 253, 260 (2d Cir. 1996)

(quoting Young, 903 F.2d at 164). Thus, in light of Pennhurst and its progeny, this Court lacks

jurisdiction to enjoin state officials under state law.

> As the Supreme Court observed:
>
> The federal system established by our Constitution preserves the
> sovereign status of the States in two ways. First, it reserves to
> them a substantial portion of the Nation's primary sovereignty,
> together with the dignity and essential attributes inhering in that
> status. The States "form distinct and independent portions of the
> supremacy, no more subject, within their respective spheres, to the
> general authority than the general authority is subject to them,
> within its own sphere." The Federalist No. 39, p. 245 (C. Rossiter
> ed. 1961) (J. Madison). . . .
>
> The States thus retain "a residuary and inviolable sovereignty."
> The Federalist No. 39, at 245. They are not relegated to the role of
> mere provinces or political corporations, but retain the dignity,
> though not the full authority, of sovereignty.

Alden v. Maine, 527 U.S. 706, 714-15 (1999).

The "question of the extent to which the state court can go when interpreting its

own laws is paradigmatically one of state law, and it is one that federal courts are singularly

unsuited to answer." Tunick v. Safir, 209 F.3d 67, 76 (2d Cir. 2000). Although this Court

cannot enjoin violations of state law, Monserrate may pursue his state law claims in state court

where the novel questions concerning the expulsion power of the Senate, the constitutionality of

-23-

Legislative Law § 3 under the New York Constitution, and the duties of state officers in complying with Legislative Law § 3 are most appropriately resolved.

## CONCLUSION

In deciding whether to issue a preliminary injunction, this Court must consider the Plaintiffs' potential for success on their claims. The question of who should represent the 13th Senatorial District is one for the voters, not this Court. See Powell v. McCormack, 395 U.S. 486, 534-35 (1969) (quoting 16 Parl. Hist. Eng. At 589) ("That the right of the electors to be represented by men of their own choice, was so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution."). For the foregoing reasons, Plaintiffs' motion to preliminarily enjoin Defendants from enforcing a resolution expelling Monserrate from the Senate, holding a special election on March 16, 2010 in the 13th Senatorial District, and removing Monserrate from the payroll of the State of New York is denied.

Dated: February 19, 2010
        New York, New York

                             SO ORDERED:


                             _____
                             WILLIAM H. PAULEY III
                             U.S.D.J.

-24-

*Counsel of record:*

Norman H. Siegel, Esq.
Norman Siegel, Attorney At Law
260 Madison Avenue, 18th Floor
New York, NY 10016

Steven J. Hyman, Esq.
McLaughlin and Stern, LLP
260 Madison Ave
New York, NY 10016
*Counsel for Plaintiffs*

Henry M. Greenberg, Esq.
Douglas J. Goglia, Esq.
New York State Office of the Attorney General
The Capitol
Albany, NY 12224
*Counsel for Defendant*s

Arthur N. Eisenberg, Esq.
New York Civil Liberties Union
125 Broad Street, 17th floor
New York, NY 10004
*For Amicus Curiae New York Civil Liberties Union*